[This opinion has been published in *Ohio Official Reports* at 87 Ohio St.3d 506.]

HARP, ADMR., APPELLANT, *v*. CITY OF CLEVELAND HEIGHTS, APPELLEE.

[Cite as *Harp v. Cleveland Hts.*, 2000-Ohio-467.]

*Municipal corporations—Political subdivision tort liability—Nuisance— Political subdivision can be held liable under R.C. 2744.02(B)(3) for injuries that result when a tree limb falls upon a public road from adjacent land that is also within the political subdivision's control.*

(No. 98-2010—Submitted September 21, 1999—Decided January 19, 2000.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 73171.

————————————

{¶ 1} This matter involves a negligence action brought by appellant, Malinda D. Harp, administrator of the estate of Ruth L. Brewer, for wrongful death and conscious pain and suffering against appellee, city of Cleveland Heights. The complaint states that Brewer was fatally injured when the limb of a tree located on city property adjacent to a public roadway fell and struck her motor vehicle. The complaint alleges that appellee breached its statutory duty to keep public roads free from nuisance. The trial court granted summary judgment in favor of appellee.

{¶ 2} The relevant facts that were before the trial court are as follows. On September 12, 1995, Brewer was driving south on Lee Boulevard in the city of Cleveland Heights about a mile north of where Lee Boulevard intersects Mayfield Road. Without warning, a forty-three-to-forty-five-foot section of a prunus serotina, or black cherry tree, crashed through her windshield, causing her death.

{¶ 3} The tree in question was located within a wooded area at the northeast corner of the Cleveland Heights portion of Forest Hills Park, which adjoins the west side of Lee Boulevard. Various measurements or estimates placed the base of the tree between sixteen and thirty feet from the curb of Lee Boulevard. The section of the tree that broke away includes a limb approximately twenty-five feet in length

and twelve to fourteen inches in diameter, and a nineteen-foot piece of the trunk that pulled away with the limb.

{¶ 4} Prior to the accident, the limb was joined to the tree 24.6 feet above the ground at a "v-crotch." From there, it extended in a northeasterly direction, generally toward oncoming southbound traffic on Lee Boulevard, to a crown height of fifty to sixty feet above the ground. The evidence is conflicting as to whether and to what extent the limb was actually overhanging the roadway prior to the accident. However, no one claims that the limb hung so low as to obstruct the flow or visibility of traffic on Lee Boulevard.

{¶ 5} On March 14, 1995, six months before the accident, the tree at issue was inspected by David Arendec, a certified arborist employed by appellee in its forestry department. Arendec's inspection was conducted as part of a computer inventory and inspection program started by appellee in 1993 or 1994. At his deposition, Arendec testified that he was instructed to pick out target trees around roads or pathways in order to ensure that they were safe. He acknowledged that his concern was whether those trees could fall on a path or road and injure a pedestrian or motorist. He stated that he chose to inspect the tree because it was one of the larger trees in the area.

{¶ 6} During his inspection, Arendec observed that the tree "had a little bit of deadwood on it," which led him to mark it for "priority pruning." Arendec explained that there are four pruning designations, which, in order of priority, include immediate prune, priority prune, training prune, and routine prune. He stated that priority prune "means it needs to be pruned sometime, put in your priority. * * * Put it on the list, get to it when we are in that area or if we are prioritizing with the other prunes in the city, behind immediate prunes."

{¶ 7} Daniel Krizner, who was also employed in appellee's Forestry Department, testified at his deposition that the reason for paying closer attention to a tree marked for priority pruning than to one that is healthy is to prevent a situation

2

involving damage to property or person or obstruction of roadways. It is undisputed that the tree was left unattended following Arendec's inspection. However, Arendec stated that the deadwood he observed on the tree was not in the part that fell, but on the other side, and that the part of the tree he was going to prune was not the part overhanging the road. He denied seeing any damage at the v-crotch where the tree eventually failed, stating, "No. I did my inspection from the ground."

{¶ 8} The parties' experts generally agree that the tree originally fractured at the v-crotch during a storm on July 28, 1993. This fracture or crack, which appellee's expert describes as "a splitting between the branch and the trunk," began to open up over time as a result of certain naturally occurring phenomena, eventually causing the limb to give way on September 12, 1995.

{¶ 9} The experts disagree, however, whether Arendec should have perceived a danger of the tree limb falling onto Lee Boulevard at the time of his inspection. Appellee's expert, Fred J. Robinson, testified that "[t]he crack was certainly not obvious from the ground." He did not think that "the split between the branch and the trunk would have been open enough [for Arendec] to see from being down at the bottom of the tree where he is close enough to estimate the size of it." In Robinson's opinion, there was no reason for appellee to suspect that the tree presented any danger to traffic on Lee Boulevard.

{¶ 10} Appellant's expert, John R. Gerlach, testified that the crack would certainly have been visible from the ground at the time of Arendec's inspection. He stated that "[a]nyone with Mr. Arendec's background and training * * * would have been able to see it." In Robinson's opinion, appellee should have known that the tree presented a danger to traffic on Lee Boulevard.

{¶ 11} In granting summary judgment upon this evidence, the trial court found that "[t]he deteriorating tree limb in question is not a nuisance which the city had a duty to abate under O.R.C. § 2744.02(B)(3) or § 723.01." The trial court

found decisive the fact that "the limb in question was not impeding traffic." According to the trial court, appellee's duty under R.C. 2744.02(B)(3) to keep roadways free from nuisance applies only to "obstructions on the road or directly above the road which imped[e] traffic (*e.g.*, low bridges, low branches, and an intersection blocked by a cornfield)."

{¶ 12} The court of appeals affirmed the trial court's decision, holding that trees growing along the side of a roadway are not nuisances within the meaning of the statute unless their limbs hang over the roadway low enough to touch and cause injury to persons or vehicles traveling thereon.

{¶ 13} This cause is now before the court pursuant to the allowance of a discretionary appeal.

_____

*Nurenberg, Plevin, Heller & McCarthy Co., L.P.A., Richard L. Demsey* and *Kathleen J. St. John*, for appellant.

*Weston, Hurd, Fallon, Paisley & Howley, L.L.P., John M. Baker* and *Hilary S. Taylor; John H. Gibbon,* Director of Law, City of Cleveland Heights, and *Laure A. Wagner,* Assistant Director of Law, for appellee.

*Barry M. Byron, Stephen L. Byron* and *John Gotherman*, urging affirmance for *amicus curiae,* Ohio Municipal League.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 14} In order to determine whether summary judgment was appropriately granted in this case, we must first decide whether a political subdivision can be held liable under R.C. 2744.02(B)(3) for injuries that result when a tree limb falls upon a public road from adjacent land that is also within the political subdivision's control. In particular, we are asked to decide whether a defective tree limb that threatens to fall onto a public road, but does not physically obstruct traffic, can constitute a nuisance for purposes of R.C. 2744.02(B)(3).

4

{¶ 15} R.C. 2744.02(A)(1) provides that a political subdivision is generally not liable for injury, death, or loss to persons or property incurred in connection with the performance of a governmental or proprietary function. R.C. 2744.02(B) sets forth several exceptions to this broad grant of sovereign immunity. As relevant here, R.C. 2744.02(B)(3) provides that "political subdivisions are liable for injury, death, or loss to persons or property caused by their failure to keep public roads, highways, [and] streets * * * within the political subdivisions open, in repair, *and free from nuisance*."[1]  (Emphasis added.)

{¶ 16} In determining when a political subdivision may be held liable under R.C. 2744.02(B)(3) for failing to keep its roadways free from nuisance, we have deemed it appropriate to consider prior case law interpreting R.C. 723.01, which requires municipal corporations to keep their highways and streets "open, in repair, and free from nuisance." See *Franks v. Lopez* (1994), 69 Ohio St.3d 345, 348, 632 N.E.2d 502, 505; *Manufacturer's Natl. Bank of Detroit v. Erie Cty. Rd. Comm.* (1992), 63 Ohio St.3d 318, 321, 587 N.E.2d 819, 822. Although the court has decided cases under R.C. 723.01 involving trees or tree limbs, none of these cases involves injury or damage caused by a tree or tree limb falling onto a roadway. See *Robert Neff & Sons v. Lancaster* (1970), 21 Ohio St.2d 31, 50 O.O.2d 80, 254 N.E.2d 693 (a municipality can be held liable for injuries resulting from a collision with a tree limb overhanging a public street); *Std. Fire Ins. Co. v. Fremont* (1955),

---

1. The General Assembly attempted to amend R.C. 2744.02(B)(3) as part of Am.Sub.H.B. No. 350, 146 Ohio Laws, Part II, 3867, 3987, effective January 27, 1997. The amendment was to change a political subdivision's duty with respect to the care of public roads by deleting the language "open * * * and free from nuisance," and replacing it with the provision that a political subdivision may be held liable for its "negligent failure to remove obstructions from public roads," and retaining the duty to keep public roads in repair. Normally, when the operative facts of a particular case predate the effective date of an amended statute, we would refer to the applicable statute in its preamended form as "*former* R.C. ___." This designation will not be used in the present case, however, since we have recently found Am.Sub.H.B. No. 350 to be unconstitutional in its entirety. *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062. The foregoing also applies to references made to R.C. 723.01 throughout this opinion. See 146 Ohio Laws, Part II, 3870.

164 Ohio St. 344, 58 O.O. 130, 131 N.E.2d 221 (a municipality cannot be held liable for damages caused by the falling of a tree on a house adjacent to where the tree stood); *Taylor v. Cincinnati* (1944), 143 Ohio St. 426, 28 O.O. 369, 55 N.E.2d 724 (a municipality can be held liable for injuries resulting from a collision with a tree standing close to the paved portion of a highway).

{¶ 17} However, in addressing a municipality's liability for damages to persons other than those using a public street, the court in *Std. Fire* reasoned:

"In several cases outside Ohio, under statutes similar to that of Ohio requiring municipalities to keep their streets in repair, it has been held that there can be no liability upon a municipality *even to travelers upon the street or highway*, and the same would be true as to those not on the highway, for injuries from falling trees or falling limbs from trees standing upon or adjacent to the traveled highway." (Emphasis added.) *Id.*, 164 Ohio St. at 350, 58 O.O. at 133, 131 N.E.2d at 226.

{¶ 18} In support, the court relied primarily on two cases involving falling trees or tree limbs, *Miller v. Detroit* (1909), 156 Mich. 630, 121 N.W. 490, and *Dyer v. Danbury* (1911), 85 Conn. 128, 81 A. 958, which held that a municipality's statutory duty to keep its roads "in repair" extends only to defects in the road itself or physical obstructions to travel thereon.

{¶ 19} The flaw in this analysis lies in the court's comparison of essentially dissimilar statutes. As applied to falling trees or tree limbs, there is a critical difference between a statute that requires a public authority to keep its streets "in repair" and a statute that requires a public authority to keep its streets in repair and also "free from nuisance."

{¶ 20} In *Dyer*, the court actually agreed that an overhanging tree limb that endangered travel by reason of its likelihood to fall upon a highway but did not obstruct traffic could constitute a nuisance. However, the court held that since the overhanging limb did not constitute a defect in the highway or obstruct travel thereon, the city was not bound to remove it as part of its statutory duty to keep its

6

roads "in repair." *Id.*, 85 Conn. at 130-131, 81 A. at 959. It is difficult to conceive how something that constitutes a nuisance by virtue of the danger it poses to highway travel would fall beyond the reach of a statute requiring a municipality also to keep its highways "free from nuisance."

{¶ 21} In *Heckert v. Patrick* (1984), 15 Ohio St.3d 402, 15 OBR 516, 473 N.E.2d 1204, paragraph two of the syllabus, this court held that "[a] board of county commissioners is not liable under R.C. 305.12 for damages caused by the falling of a tree or its branches onto a county road." Former R.C. 305.12 was similar to the statute considered in *Dyer*, but dissimilar to R.C. 723.01 or R.C. 2744.02(B)(3), because it required a public authority to keep its roads "in proper repair" but not also "free from nuisance." 1953 H.B. No. 1. Relying on this very distinction, we explained:

"While it is clear that the commissioners do not have a statutory duty pursuant to R.C. 305.12 to trim or remove tree limbs which overhang a county road, appellants focus attention on cases decided under R.C. 723.01 in an effort to place liability on the commissioners. These cases, however, are not applicable here. R.C. 723.01 contains the language 'and free from nuisance,' which has been interpreted by this court to include more than just conditions of the roadway. The failure of the General Assembly to place this language in R.C. 305.12 clearly indicates its intention not to impose liability on the commissioners in matters unrelated to actual roadway conditions." (Footnote omitted.) *Id.*, 15 Ohio St.3d at 407, 15 OBR at 520, 473 N.E.2d at 1209.

{¶ 22} Thus, the theoretical construction underlying *Std. Fire* is formulated from an erroneous attempt to coordinate dissimilar statutes, which should yield dissimilar results. Under this construction, a nuisance that creates a danger for ordinary traffic on a public road is not a nuisance under R.C. 723.01 unless it obstructs travel or exists in the roadway itself. The essential supporting logic is that since a municipality's duty under a statute requiring public roads to be kept "in

repair" is limited to obstructions and roadway defects, the same limitation must prevail under a statute requiring municipalities to keep its roads "in repair, and free from nuisance." Under this reasoning, the term "free from nuisance' is essentially removed from R.C. 723.01 as mere surplusage or, at best, changed to read "free from obstructions to travel thereon." Thus, what began as a duty to keep public roads free from nuisance becomes a duty to remove obstructions from public roads, and a nuisance that creates a danger to ordinary traffic is said to fall beyond the scope of a statute requiring a municipality to keep its roads free from nuisance.

{¶ 23} In *Manufacturer's, supra*, 63 Ohio St.3d at 322, 587 N.E.2d at 823, we rejected the view that liability under R.C. 723.01 or 2744.02(B)(3) is limited to physical conditions in the roadway itself and does not extend to adjacent property. After construing prior case law, we decided that the proper focus in determining a political subdivision's duty under R.C. 2744.02(B)(3), or a municipality's under R.C. 723.01, "should be on whether a condition exists within the political subdivision's control that creates a danger for ordinary traffic on the regularly travelled portion of the road." Applying this analysis to a cornfield growing within the highway right-of-way, we reasoned that "[a] visibility obstruction can be as hazardous to the highway's safety as a malfunctioning traffic light, a pothole in the roadway, or a rut in shoulder. * * * The relevant focus is on the *effect* of the obstruction on the highway's safety, not on the *nature* of the particular obstruction." (Emphasis *sic*.) *Id.*, 63 Ohio St.3d at 323, 587 N.E.2d at 823-824.

{¶ 24} In *Franks, supra*, 69 Ohio St.3d at 348, 632 N.E.2d at 505, we applied the same analysis and found that "[a] sign which has lost its capacity to reflect is as much an impediment to the safe flow of traffic as a malfunctioning traffic light, overhanging branches or foliage obstructing a driver's view."

{¶ 25} Clearly, an unsound tree limb that threatens to fall onto a public road from adjacent property can be a nuisance that makes the usual and ordinary course of travel on the roadway unsafe. Although not physically obstructing or impeding

the flow or visibility of traffic, a tree limb threatening to fall upon a public road can be just as dangerous to the highway's safety as one that obstructs a driver's vision, obscures a stop sign, or hangs over the roadway low enough to strike traffic. Contrary to the holdings below, R.C. 2744.02(B)(3) contains no language that limits a political subdivision's duty to the removal of obstructions from public roads. See fn. 1.

{¶ 26} Accordingly, we hold that a political subdivision can be held liable under R.C. 2744.02(B)(3) for injuries that result when a tree limb falls upon a public road from adjacent land that is also within the political subdivision's control.

{¶ 27} "This does not end the analysis however. In *Vogel v. Wells* (1991), 57 Ohio St.3d 91, 97, 566 N.E.2d 154, 160, a nuisance case decided in part under R.C. 723.01, we reiterated that the political subdivision must have had 'either actual or constructive knowledge of the nuisance' before liability can be imposed. There is constructive knowledge if 'such nuisance existed in such a manner that it could or should have been discovered, that it existed for a sufficient length of time to have been discovered, and that if it had been discovered it would have created a reasonable apprehension of a potential danger * * *.' *Beebe v. Toledo* (1958), 168 Ohio St. 203, 207, 6 O.O.2d 1, 3, 151 N.E.2d 738, 741." *Franks, supra*, 69 Ohio St.3d at 349, 632 N.E.2d at 505.

{¶ 28} Appellant contends that the city had both actual and constructive notice of the nuisance in this case. We disagree as to actual notice. Although Arendec acknowledged that the general purpose of appellee's inspection program was to locate and identify trees that could fall on a road and injure a motorist, he did not specifically choose to inspect the tree at issue out of any suspicion that it posed a potential danger to traffic on Lee Boulevard. Instead, he chose to inspect it because it was one of the larger trees in the area. While Arendec observed some deadwood on the tree at the time of his inspection, he testified that this deadwood was on the side of the tree facing away from the roadway and that he observed no

damage at the v-crotch where the tree eventually failed. Having marked the tree for priority pruning, he had no intention of pruning the limb that overhung the road. Construing this evidence most strongly in appellant's favor, we find that reasonable minds could not conclude that appellee had actual knowledge prior to September 12, 1995, that the tree limb in question posed a danger to traffic on Lee Boulevard.

{¶ 29} However, despite the lack of evidence to suggest that appellee had any reason to suspect that the tree endangered travel on southbound Lee Boulevard prior to Arendec's inspection, Arendec did in fact inspect the tree. Regardless of how or why Arendec came to inspect this specific tree, the purpose of his inspection was, at least in part, to ascertain the condition of the tree and its potential to cause injury. Gerlach testified that the crack that formed at the v-crotch would have been visible from the ground at the time of Arendec's inspection, and that anyone with Arendec's background would have been able to see it. In Gerlach's opinion, Arendec's inspection should have revealed that the tree presented a danger to traffic on Lee Boulevard. If the jury believes Gerlach's testimony, it could reasonably conclude that appellee could or should have discovered the condition of the limb six months prior to the accident, and that the discovery would have created a reasonable apprehension of a danger to traffic on Lee Boulevard. Thus, we find that a question of fact remains as to whether appellee had constructive notice of the nuisance.

{¶ 30} Appellee contends that even if questions of fact remain as to whether it breached its duty under R.C. 2744.02(B)(3), it is nevertheless immune from liability because R.C. 2744.01(C)(2)(u) defines a "governmental function" to include "[t]he design, construction, reconstruction, renovation, repair, maintenance, and operation of any park." Appellee makes the same contention with regard to R.C. 2744(C)(2)(p), which defines a "governmental function" to include "[t]he provision or nonprovision of inspection services of all types." These contentions reflect a persistent misunderstanding that the designation

"governmental function" is enough to confer immunity. For the reasons stated in *Cater v. Cleveland* (1998), 83 Ohio St.3d 24, 697 N.E.2d 610, we reject these contentions and find that these functions, although defined as "governmental functions" in R.C. 2744.01(C)(2), are subject to the exception to immunity set forth in R.C. 2744.02(B)(3).

{¶ 31} In order to assuage any fear that municipalities and political subdivisions will now be required to inspect all the trees within their limits that stand alongside public roads, we find it necessary to stress the limits of our decision. Actual or constructive notice remains a prerequisite to liability under R.C. 2744.02(B)(3) or 723.01. Nothing that we have said today requires a municipality or political subdivision to inspect any tree solely because of its proximity to a public road. The fact that a tree stands close to a public road, or that its limbs overhang the roadway, is not in itself sufficient for purposes of actual or constructive notice. Nor are municipalities or political subdivisions required to develop and maintain any additional inspection program, since we do not find fault with the inspection program used by appellee. We have determined only that the evidence in this case shows that there is a genuine issue of fact as to whether appellee, *upon inspection of the offending prunus serotina*, could or should have discovered and appreciated the danger it posed to ordinary traffic on Lee Boulevard.

{¶ 32} Based on all of the foregoing, we find that summary judgment was inappropriately granted. The decision of the court of appeals is reversed, and the cause is remanded to the trial court for further proceedings.

*Judgment reversed*
*and cause remanded.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY and PFEIFER, JJ., concur.

DOUGLAS, J., concurs separately.

COOK and LUNDBERG STRATTON, JJ., dissent.

———————————

**DOUGLAS, J., concurring.**

{¶ 33} While I concur in the judgment of the majority, I do so while continuing to adhere to my dissent in *Gladon v. Greater Cleveland Regional Transit Auth.* (1996), 75 Ohio St.3d 312, 323, 662 N.E.2d 287, 296.

———————————

**COOK, J., dissenting.**

{¶ 34} Where there once was liability under R.C. 2744.02(B)(3) for political subdivisions with notice of existing, potentially dangerous, off-road conditions, political subdivisions now face liability for off-road conditions that merely *threaten* to become a nuisance. The majority here unduly expands a political subdivision's potential liability for failure to keep public roads "open, in repair, and free from nuisance."

{¶ 35} Today's decision expands an exception to sovereign immunity in two steps: first, the majority broadens the definition of "nuisance" under R.C. 2744.02(B)(3) to include a previously unrecognized category of conditions; second, the majority charges the political subdivision here with constructive notice of a nuisance — a fallen branch — before it qualified as a nuisance.

1. *Expanding the Definition of "Nuisance"*

{¶ 36} The majority's decision reverses two lower courts and denies immunity to the city here even though the city enjoys broad immunity. See R.C. 2744.02(A) and (B). Our past practice — exemplified by a case from half a century ago concerning the exact language at issue here — has been to construe exceptions to sovereign immunity narrowly. See *Wall v. Cincinnati* (1948), 150 Ohio St. 411, 38 O.O. 289, 83 N.E.2d 389 (construing the phrase "open, in repair, and free from nuisance" strictly, due to its being in derogation of common-law sovereign immunity). We examine two cases upon which the majority relies to illustrate its expanded nuisance definition.

12

**{¶ 37}** In one of the principal cases relied upon by the majority, this court held that a "*permanent obstruction to visibility*, within the highway right-of-way, which renders the regularly travelled portions of the highway unsafe for the usual and ordinary course of travel, can be a nuisance for which a political subdivision may be liable under R.C. 2744.02(B)(3)." (Emphasis added.) *Manufacturer's Natl. Bank of Detroit v. Erie Cty. Rd. Comm.* (1992), 63 Ohio St.3d 318, 587 N.E.2d 819, at paragraph one of the syllabus. In the other principal case relied upon by the majority, this court held that a "township's alleged *failure to maintain * * * signage already in place* may constitute an actionable nuisance claim" (emphasis added) under the township immunity exception. *Franks v. Lopez* (1994), 69 Ohio St.3d 345, 348, 632 N.E.2d 502, 505.

**{¶ 38}** Both of these cases centered on the physical *location* of a dangerous condition for purposes of nuisance liability. Both simply stand for the proposition that "nuisance" may indeed include a dangerous condition that exists *outside the physical confines of the roadway itself*, yet still obstructs the flow or visibility of traffic *on the roadway*. Today, however, the majority defines nuisance to include a "threatened" condition, not directly connected to the roadway, that never obstructed or impeded the flow or visibility of traffic *until the very moment that an accident occurred*.

**{¶ 39}** In *Manufacturer's*, a cornfield growing in the right-of-way affected the safety of ordinary traffic by continually impairing drivers' sightlines around the corner at an intersection. The *Manufacturer's* court explicitly stressed the limits of its decision, noting that "[o]ur decision today does not imply that a political subdivision may be held liable for a *temporary obstruction to visibility* such as an illegally parked car." (Emphasis added.) *Manufacturer's*, 63 Ohio St.3d at 323, 587 N.E.2d at 823, fn. 2.

**{¶ 40}** In *Franks* too, we expressly restricted the scope of nuisance liability for purposes of R.C. 2744.02(B)(3). *Franks*, 69 Ohio St.3d at 346, 632 N.E.2d at

503-504. The *Franks* court reiterated *Manufacturer's* holding that a nuisance is an *existing* condition that creates dangers for ordinary traffic and determined that a township's failure to maintain signage that was "already in place" when the accident occurred could constitute actionable nuisance. *Id.*, 69 Ohio St.3d at 348, 632 N.E.2d at 505.

{¶ 41} Thus, *Manufacturer's* and *Franks* were both cases that defined "nuisance" under the immunity exception as an *existing* obstruction or condition that *actually impeded the safe flow of traffic before the accident in question occurred*. Just recently, we reaffirmed this position when we held that nuisance has most often been defined to include "physical obstructions that interfere with visibility and create an unsafe condition." *Cater v. Cleveland* (1998), 83 Ohio St.3d 24, 30, 697 N.E.2d 610, 616.

{¶ 42} In this case, however, the majority uses *Manufacturer's* and *Franks* as springboards for its much broader holding that a tree limb—which prior to the accident in question did not obstruct or interfere with visibility or traffic in any way—may qualify as a nuisance under R.C. 2744.02(B)(3). But here, even the majority concedes that "no one claims that the limb hung so low as to obstruct the flow or visibility of traffic on Lee Boulevard" at any time prior to the accident. The limb, therefore, did not constitute a nuisance of the type recognized in *Manufacturer's* or *Franks*.

### 2. *Expanding the Concept of Constructive Notice*

{¶ 43} Even if this tree limb could properly qualify as a nuisance under broadly worded dicta culled from *Franks* and *Manufacturer's*, the city could not properly be charged with having constructive notice on these facts. Though the majority recites the three elements of constructive notice, the majority appears to focus on the third — that the city's reasonable apprehension of "potential danger" is required in order to charge it with constructive notice. But this strategy glosses over the two additional requirements for constructive notice: that constructive

14

knowledge of a nuisance may be imposed only where the nuisance " '*existed* in such a manner that it could or should have been discovered [and] that it *existed for a sufficient length of time* to have been discovered.' " (Emphasis added.) *Franks*, *supra*, 69 Ohio St.3d at 349, 632 N.E.2d at 505, quoting *Beebe v. Toledo* (1958), 168 Ohio St. 203, 207, 6 O.O.2d 1, 3, 151 N.E.2d 738, 741. In *Franks*, because "[o]verhanging branches and foliage which obscure traffic signs * * * are easily discoverable," we determined that there was a question of fact as to whether the township could be charged with constructive notice of the dangerous condition. *Id.*

{¶ 44} The *Franks* court's interpretation of constructive notice in the context of a roadway nuisance would absolve the city here. The tree branch in this case, like all tree branches that grow over public roads, posed only a potential to become a nuisance. This road was "free from nuisance" until this branch fell. Since the branch did not become a nuisance until it fell, there is no constructive-notice issue. That is, it cannot be said that the city failed to remedy the potentially dangerous condition (the fallen branch) within a reasonable time. The branch did not obstruct or impede the flow or visibility of traffic until it fell.

{¶ 45} The majority stresses the limits of its decision, noting that actual or constructive notice remains a prerequisite to liability under R.C. 2744.02(B)(3). It would seem that the practical effect of this limitation would be to discourage municipalities from *inspecting at all* those tree limbs that exist above roadways.

{¶ 46} For the foregoing reasons, I would affirm the judgment of the court of appeals.

LUNDBERG STRATTON, J., concurs in the foregoing dissenting opinion.

_____